Peter D. Raymond
Geoffrey G. Young
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



KGK JEWELRY LLC,

               Plaintiff,

    v.

ESDNETWORK and STEVE YEKO,

               Defendants.

No.  11 CIV 9236 (LTS) (RLE)

**SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

Plaintiff, KGK Jewelry LLC ("KGK" or "Plaintiff"), by its counsel Reed Smith LLP,

brings this action against defendants ESDNetwork ("ESDN") and its principal, Steve Yeko

("Yeko") (collectively, "Defendants"), for damages arising from breach of certain contracts

between the parties, specific performance of those contracts, and for injunctive relief stopping

Defendants from continuing to withhold valuable customer information from KGK and/or its

retail store customers and improperly contacting KGK's retail stores in an attempt to divert and

steer KGK's business opportunities to Defendants.  In addition, KGK seeks damages and other

relief stemming from Defendants' tortious interference with KGK's contracts and business

relations with its retail store customers.  As such, KGK respectfully alleges as follows:

### NATURE OF ACTION

1.     KGK is a jewelry manufacturer which provides Internet-based computer

marketing services to 70 independent retail jewelry stores.  KGK hired Defendants to create the

software and operate the computer system through which the jewelry stores could access these marketing and sales services.  This is an action to enforce KGK's contractual rights as against Defendants, who have breached their contractual obligation to KGK in an attempt to extract monies allegedly due for services unrelated to the contracts at issue.

2.      Defendants' breaches of their contractual obligations to KGK include (i) refusing to provide KGK and/or its retail stores with certain retail stores' customer information located on the KGK computer system and (ii) improperly contacting KGK's retail stores in an attempt to divert and steer KGK's business opportunities to Defendants.  These actions not only constitute material breaches of the contracts between KGK and Defendants, but they also have caused KGK to be in breach of its contractual obligations to its retail stores and/or caused damage to KGK's business relations and opportunities.

3.      Accordingly, KGK brings this action for specific performance to hold Defendants to their contractual obligations and for a preliminary and permanent injunction stopping Defendants from withholding valuable customer information and improperly contacting KGK's retail stores in an attempt to divert and steer KGK's business opportunities to Defendants.  KGK further seeks damages and other relief stemming from Defendants' tortious interference with KGK's contracts with third parties and its business relations, Defendants' past and ongoing breaches of the parties' contracts, and unfair competition.

**THE PARTIES**

4.      Plaintiff KGK is a New York limited liability company with its principal place of business located at 605 5th Avenue, New York NY 10017.  KGK is comprised of the following five (5) members:

a.      Vinamra Kothari, who is domiciled in the State of New Jersey.

b. KGK Holding Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018.

c. KGK Properties USA Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018.

d. KGK Creations USA Inc., a corporation organized under the laws of New York, with its principal place of business located at 70 West 36th Street, 6th Floor, New York, NY 10018.

e. Unique Holding (US) Inc., a corporation organized under the laws of Delaware, with its principal place of business located at 36 West 44th Street, 13th Floor, New York, NY 10036.

5.      Upon information and belief, Defendant ESDN is a privately-held company organized under the laws of Wisconsin, with its principal place of business located in Janesville, Wisconsin. Upon information and belief, ESDN is in the business of providing web-based marketing tools and services to those in the retail supply chain, and conducts a substantial amount of business in the State of New York, including in this District.

6.      Upon information and belief, defendant Yeko is domiciled in the State of Wisconsin, and is the CEO of ESDN. Upon information and belief, Yeko conducts a substantial amount of business in the State of New York, including in this District.

## JURISDICTION AND VENUE

7.      Federal subject matter jurisdiction exists under 28 U.S.C. § 1332 in that the named parties to this action are of completely diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

8.     This Court has personal jurisdiction over Defendants because, upon information and belief, they conduct a substantial amount of business in the State of New York and this District, including through their substantial and continuous business relationship with Plaintiff, which resides in this District.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because this District has personal jurisdiction over Defendants and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATEMENT OF FACTS

### KGK's Contracts With 70 Retail Jewelry Stores

10.     KGK has been manufacturing and designing jewelry for over 100 years.  As one part of its business, KGK provides marketing and promotional services to retail jewelry stores through a fully-customized computer marketing program that it licenses to the stores.  The software support for the marketing program was developed by Defendants.

11.     As part of the marketing program, KGK provides every retailer with an in-store kiosk (*i.e.*, touch screen tablet computer) that provides real-time access to that retailer's entire inventory, including the extensive "virtual inventory" of jewelry products manufactured by KGK, as well as supplier/manufacturer product information, pricing, availability, and images. The kiosk can also instantaneously provide customer order history.

12.     Among other services offered through the KGK marketing program, retailers enrolled in the program receive customized marketing services through television commercials, newsletters, catalogs, social media, and in-store events.  A critical component of the marketing program is that the kiosk enables each retailer's customers to input their email addresses when utilizing the kiosk, such as when registering for promotional events.  The retailers use these

email addresses to periodically send notifications regarding sales and other store information to customers to improve sales and customer loyalty.

13.    KGK has entered into contracts with 70 independent retail jewelry stores regarding the aforementioned marketing program.  True and correct copies of representative KGK retailer contracts are collectively annexed hereto as Exhibit A.

14.    In February 2012, as a result of Defendants' misconduct which is the subject-matter of this action, KGK switched from the computer system developed by Defendants to a new system developed by a third party.  When KGK utilized Defendants' computer system for the kiosks, Defendants maintained and operated the system, but now that the kiosks are running on a different system, KGK operates and maintains the kiosks and the system itself.

15.    Since switching to a new kiosk system, KGK has ended its business relationship with Defendants.

## KGK's Two Contracts With Defendants

16.    Pursuant to two separate written agreements, both dated October 20, 2011, Defendants agreed to provide an itemized list of services to KGK and its retail jewelry store customers in connection with the above-referenced marketing program (the "Yeko Contracts").  True and correct copies of the Yeko Contracts are collectively annexed hereto as Exhibit B.

17.    Specifically, Defendants agreed to provide the following marketing services to certain retail jewelry stores customers of KGK for a twelve-month time period:

- Membership in the ESDN software system, including access to KGK's online virtual catalog;
- Support and maintenance from ESDN;
- A 24-inch touch screen computer customized for each retailer;
- 18 E-Blasts to customers, including through social media;
- 3 customized video E-Blasts; and
- Banking setup fees.

18.     As of October 20, 2011, when Yeko executed the Yeko Contracts, 70 retail stores had licensed the KGK marketing program.

19.     As reflected in the Yeko Contracts, as of October 20, 2011, KGK had already fully paid Defendants for 52 of the retail stores enrolled in the program and agreed to pay for the remaining 19 enrolled retailers once Defendants had complied with their obligations for the first 52 retailers, including providing each with a functioning kiosk.

20.     Although Defendants did not provide all the retailers with kiosks or performed all of their obligations under the Yeko Contracts, including providing each retailer access to the computer system for which KGK has already paid Defendants, KGK has paid over $350,000 to Defendants under the Yeko Contracts.

21.     After executing the Yeko Contracts, Defendants claimed that they were owed monies from KGK for services not included in the Yeko Contracts.  To date, Defendants have demanded nearly $1 million for such services.

22.     Even though KGK's purported obligation to pay these amounts does not arise from the Yeko Contracts, Defendants have made several written threats to cut off all of the computer marketing services which, prior to February 2012, they maintained and operated for KGK's 70 retail jewelry store customers unless KGK succumbed to Defendants' unrelated monetary demands.

23.     Defendants have made this same threat in several emails to KGK since December 2011.  For example, by email dated December 8, 2011, Yeko advised KGK that he would "shut off all services to any KGK retailer as of Friday [December 16, 2011] at noon" if no resolution is reached regarding the additional amounts demanded by Defendants.

24.     Well-known to Defendants, the prospect of turning off all computer marketing services provided to KGK's third-party retail customers would wreak havoc on the retailers' business. Such action would also cause KGK to be in breach of its 70 contracts with its retail store customers.

25.     In response to Defendants' threatened action, on December 16, 2011, KGK commenced this action and was prepared to seek a temporary restraining order and preliminary injunction to stop Defendants from carrying out their threats. However, on that same date, counsel for Defendants advised that they would refrain from shutting off KGK's computer system if KGK did not seek a temporary restraining order and preliminary injunction, to which KGK agreed.

26.     However, since that time, Defendants continued to make similar threats of shutting off KGK's computer system in connection with Defendants' unrelated monetary demands.

27.     In an effort to mitigate the harm caused by Defendants threatened action, in February 2012, KGK switched to a new kiosk system and ceased working with Defendants.

**Defendants Interference With KGK's Business Relationships and Contracts**

28.     Since December 2011, when Defendants threatened to shut off KGK's kiosk system, Defendants have also engaged in additional misconduct that has caused and continues to cause damage to KGK, including withholding valuable customer information from KGK and/or its retail stores and improperly contacting KGK's retail stores to encourage them to cease working with KGK and use Defendants' competing services.

29.     In early February 2012, KGK learned that Defendants were improperly in possession of certain email addresses that KGK's retailers' customers had supplied through the

retailer's respective kiosks. KGK demanded that Defendants immediately provide the email addresses to KGK and/or the respective retail stores, but Defendants have continued to improperly withhold this valuable customer information from KGK and/or its retail stores.

30.     Defendants' refusal to provide these email addresses to KGK and/or the respective retail stores constitutes a breach of the Yeko Contracts in that Defendants' authority to retain and/or possess information stored on the kiosks was limited to the fulfillment of its marketing services detailed in the Yeko Contracts. Defendants' retention of these email addresses is a breach of the limited authority conferred upon them in the Yeko Contracts.

31.     In addition, Defendants' conduct has caused KGK to be in breach of its contractual obligations to its retail stores. Specifically, Defendants' actions have precluded KGK from providing its retail stores with certain customer information that KGK has agreed to provide and the retail stores expect KGK to provide.

32.     In early February 2012, KGK further learned that Defendants were improperly contacting KGK's retail stores, including but not limited to communications through the kiosks, in an attempt to intentionally divert and steer KGK's business opportunities to Defendants, including the marketing services that are the subject matter of the Yeko Contracts.

33.     KGK demanded that Defendants immediately cease their wrongful use of the kiosks and contacting KGK's retailers for wrongful purposes, but, upon information and belief, Defendants have continued their misconduct.

34.     Defendants' refusal to cease improperly contacting KGK's retail stores constitutes a breach of the Yeko Contracts in that Defendants' authority to contact KGK's retail store customers was limited to the fulfillment of its marketing services detailed in the Yeko Contracts. Defendants' communications with KGK's retail stores, including through the kiosks, to steer

KGK's business opportunities to Defendants is a breach of the limited authority conferred upon them in the Yeko Contracts.

35.    Accordingly, KGK brings this action to prevent Defendants from taking any action to further damage the businesses of KGK and numerous independent retailers, and to seek the recovery of damages and other relief stemming from the damage that Defendants' actions have already caused to KGK.

**Defendant Yeko's Improper Use of Defendant ESDN as a Corporate Veil**

36.    There is such unity between Defendants ESDN and Yeko that the separateness of ESDN has ceased, and holding only ESDN (and not Yeko) liable for the misconduct detailed herein would result in injustice.

37.    Upon information and belief, Yeko has a majority financial interest in ESDN and exercises total domination and control over ESDN.

38.    Upon information and belief, ESDN's sole purpose has been to serve Yeko for his individual interest, profit, benefit and advantage.  ESDN merely operates as the alter ego of Yeko.

39.    For example, the Yeko Contracts were executed by Yeko without any indication that he was executing the agreements in his capacity as the CEO of ESDN.  (See Exh. B.)  As such, Yeko is, as an individual, a party to the Yeko Contracts and he apparently used ESDN in an attempt to fulfill his obligations under those agreements.

40.    Furthermore, the "About Us" webpage of ESDN's website (http://esdn.com) refers solely to Yeko and his accomplishments.  No other officers or directors of ESDN, if any exist, are represented.  A true and correct copy of the "About Us" webpage from ESDN's website is annexed hereto as Exhibit C.

41.     Moreover, upon information and belief, the finances of ESDN are co-mingled with and integrally tied to those for Yeko.  In this way, and many other ways, Yeko has made ESDN indistinguishable from himself, proving that ESDN is Yeko's alter ego.

42.     Accordingly, upon information and belief, Yeko authorized, directed and approved of ESDN's unlawful actions, as detailed herein, and/or knew, or should have known, that ESDN was taking such unlawful actions against KGK.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

43.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

44.     The Yeko Contracts are valid and enforceable agreements.

45.     KGK has performed each of its obligations under the Yeko Contracts, and is ready, willing, and able to continue performing under the Yeko Contracts where necessary.

46.     By reason of Defendants' foregoing acts and omissions, Defendants have materially breached and repudiated their obligations under the Yeko Contracts, including the implied covenant of good faith and fair dealing, by (i) withholding valuable customer information from KGK and/or its retail stores and (ii) improperly contacting KGK's retail stores through the kiosks in an attempt to divert and steer KGK's business opportunities to Defendants.

47.     Despite due demand, Defendants have failed and/or refused to cure their material breaches under the Yeko Contracts.

48.     Defendants' material breaches of the Yeko Contracts have irreparably injured, and unless enjoined will continue to irreparably injure, KGK and its third-party retailers. Damages alone are inadequate to compensate KGK for Defendants' wrongful conduct, and KGK is entitled to specific performance of Defendants' obligations under the Yeko Contracts.

49.     Alternatively, as a direct and proximate result of Defendants' material breach of contract, KGK has suffered damages in an amount to be determined at trial, but believed to be no less than $3,000,000, exclusive of interest and costs.

## SECOND CAUSE OF ACTION
### (Injunctive Relief)

50.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

51.     As detailed above, Defendants' actions to date are improper and clearly constitute material breaches of the Yeko Contracts, including by (i) withholding valuable customer information from KGK and/or its retail stores and (ii) improperly contacting KGK's retail stores through the kiosks in an attempt to divert and steer KGK's business opportunities to Defendants.

52.     Unless immediate, preliminary and permanent injunctive relief is granted, Plaintiff will be irreparably harmed because Plaintiff lacks an adequate remedy at law and Defendants' actions have caused and will continue to cause KGK to be in breach of its contracts with third-party retailers.

53.     As a result, Plaintiff is entitled to an injunction preliminarily and permanently restraining and enjoining Defendants from continuing with their aforementioned misconduct and from carrying out their aforementioned threatened misconduct, and directing Defendants to meet their obligations under the Yeko Contracts.

## THIRD CAUSE OF ACTION
### (Tortious Interference with Existing Contracts with Third Parties)

54.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

55.     KGK has maintained valuable business relationships with its retail store customers, and has entered into valid and enforceable contracts with those customers.

56.     As Defendants are a vendor that KGK retained to provide services to KGK's retail store customers in furtherance of KGK's contractual obligations with those customers, Defendants had and continue to have personal knowledge of those valuable customer relationships and contracts.

57.     Knowing how important and valuable these relationships and contracts are to KGK, Defendants' actions, to date, have caused KGK to be in breach of its contractual obligations to its customers, including by withholding valuable customer information from KGK and/or its retail stores.

58.     Because of the aforementioned intentional actions of Defendants, KGK has been severely damaged by the loss of current and potential business opportunities, as well as both present and future opportunities.

59.     Furthermore, the harm caused by Defendants' aforementioned intentional and wrongful actions is ongoing because Defendants continue to withhold valuable customer information from KGK and/or its retail stores.

60.     As a direct and proximate cause of the foregoing, KGK has suffered actual damages in an amount to be proven at trial, but not less than $1,000,000 plus punitive damages.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with Prospective Business Relationships)

61.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

62.     KGK enjoys a reputation of excellence in the jewelry industry.  KGK's reputation and success has, for decades, permitted it to develop business relationships with numerous individuals, entities and companies.

63.    Knowing full well how important these relationships are to KGK, Defendants' actions, to date, have interfered with KGK's business opportunities, including by improperly contacting KGK's retail stores in an attempt to intentionally divert and steer KGK's business opportunities to Defendants.

64.    Because of the aforementioned intentional and wrongful actions of Defendants, KGK has been severely damaged by the loss of current and potential business opportunities, as well as both present and future opportunities.

65.    Furthermore, the harm caused by Defendants' aforementioned intentional and wrongful actions is ongoing because, upon information and belief, Defendants continue to improperly contact KGK's retail stores in an attempt to intentionally divert and steer KGK's business opportunities to Defendants.

66.    As a direct and proximate cause of the foregoing, KGK has suffered actual damages in an amount to be proven at trial, but not less than $3,000,000, plus punitive damages.

## FIFTH CAUSE OF ACTION
### (Unfair Competition)

67.    Plaintiff restates and re-alleges each and every foregoing paragraph of this Complaint as if fully set forth herein.

68.    KGK has devoted substantial amounts of labor, skill and money to the development of its business, including, without limitation, the products it sells, its pricing methods for its products, the services it provides, and goodwill in the industry.

69.    Upon information and belief, Defendants have engaged in an intentional course of conduct for the sole purpose of gaining an unfair commercial advantage over KGK by, without limitation, tortiously and improperly contacting KGK's retail stores in an attempt to intentionally divert and steer KGK's business opportunities to Defendants.

70.     Defendants' intentional and wrongful acts have caused and will continue to cause damage to KGK in an amount to be determined at trial as well as continue to cause damage including, but not limited to, immediate and irreparable harm for which KGK has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, KGK prays for relief as follows:

A.     That judgment be entered in favor of KGK and against Defendants on all claims;

B.     For an Order requiring specific performance of the Yeko Contracts and/or temporarily restraining and preliminarily and permanently enjoining Defendants, their partners, officers, directors, principals, agents, servants, employees, successors and assigns, and all other persons in active concert, privity or in participation with Defendants, jointly and severally, from (i) withholding valuable customer information from KGK and/or its retail stores and (ii) improperly contacting KGK's retail stores through the kiosks, or otherwise, in an attempt to divert and steer KGK's business opportunities to Defendants.

D.     For actual damages in an amount to be determined at trial;

E.     For attorneys' fees and costs incurred herein;

F.     For pre-judgment interest according to proof; and

G.     For such other relief as the Court deems just, proper and equitable.

## JURY TRIAL DEMAND

Plaintiffs hereby demands a trial by jury of any and all issues so triable.


Dated:   New York, New York          **REED SMITH LLP**
         May 14, 2012

                                      By: _____
                                          Peter D. Raymond
                                          Geoffrey G. Young
                                      599 Lexington Avenue
                                      New York, New York 10022
                                      Tel: (212) 521-5400
                                      Fax: (212) 521-5450

                                      *Attorneys for Plaintiff*

# EXHIBIT A



Over 106 Years
of Commitment & Trust
to the Trade



**NEW YORK**
**KGK JEWELRY LLC**
866-KGK-8080
Kgkjewelry.com

**BELGIUM**
**KGK Diamonds**
**B.V.B.A.**

**RUSSIA**
**S.D. Diamond LLC**

**SOUTH AFRICA**
**KGK Star Rough**
**(PTY) Ltd.**

**INDIA**
**KGK Enterprises**

**CHINA**
**KGK Jewellery**
**Mfg. Ltd.**

**HONG KONG**
**KGK Jewellery**
**(HK) Ltd.**

**THAILAND**
**KGK Gems Limited**

**UAE**
**KGK Diamond &**
**Jewellery LLC**

**JAPAN**
**KGK Jewellery Inc.**

# KGK JEWELRY LLC
### (Affiliate of KGK Diamonds Mumbia a DTC Sightholder)

Dear Alexander's,

On behalf of KGK Jewelry, it is with great pleasure that we thank you for your business and appreciate your continued support. We hope you share in our excitement as we embark on the journey to promote the most important brand of all—**YOUR OWN!**

As discussed with your sales representative, below is a list of your purchased programs, agreed payment terms and other several important details.

In addition, we have also included the Marketing Investment Level for which you currently qualify.

## Your Purchased Programs:

| | |
|---|---|
| 1 | Our Destiny (Y-qlty) |
| 2 | CoCo Couture |
| 3 | Signature Colors |

## Your Marketing Investment Level is:

**Emerald Level**

KGK Jewelry will invoice marketing support as listed below; payments will begin 30 days after receipt of initial merchandise received.  Below is the payment schedule for your Investment Level.

**Emerald Level = $3000; 4 equal payments**

## Your Agreed Payment Terms:
**Three equal payments due 1/15/12, 2/15/12, and 3/15/12**

As a reminder and for your convenience, below is a list of the marketing components included in the E-commerce marketing campaign.

1   Customized Home Page available (if needed)
2   ESDN membership with KGK's $5 million virtual inventory
3   ESDN annual support
4   Quick Hits / E-blasts: 6 quick hits per collection
5   Facebook / Twitter interaction
6   24" touch-screen computer monitor, customized for your store
7   Personalized duratrans: 2 per collection
8   Personalized in-store display with every program purchased
9   Personalized postcards with every program purchased
10  In-store events
11  Lookbooks with program purchased
12  Customer video E-blasts
13  Consumer Protection Cards
14  Personalized newspaper and billboard templates
15  SPIFF Program: automatic re-order program
16  TV commercials
17  Personalized displays
18  Custom Flyer Production
19  Flip Catalog: digital catalog for emailing
20  National Monthly Drawing

**Our representative will be contacting you shortly to review your website and to answer any additional technical questions you might have.

Again, we thank you for your order and encourage you to contact us should you have any questions regarding your e-commerce marketing program.

Sincerely,

Kristin Stevens
Marketing Coordinator
1-866-545-8080 ext. 107

Susan Hect
Customer Website Project Manager
1-866-545-8080 ext. 106

Kathryn Hecht
Director of Customer Relations
1-866-545-8080 ext. 105



Over 106 Years
of Commitment & Trust
to the Trade

# Jeweler's Commitment

1. The jeweler must submit payment in full for all invoiced merchandise before an exchange authorization can be generated. Merchandise cannot be exchanged within 12 months of initial program invoice. Only initial program merchandise is eligible for exchange; re-ordered merchandise is not eligible for exchange. Merchandise being exchanged must be done within 14 months from the date of invoice.

2. Marketing support and investment level are determined only after the agreed exchange dollars are deducted from the jeweler's annual invoices.

3. To be eligible for exchange privileges, the jeweler must agree to the automatic replenish program. The replenish product will be shipped to the jeweler within 3 business days for the non-branding inventory or 14 business days for branded inventory.

4. To receive an exchange authorization, the jeweler must adhere to the KGK Jewelry extensive marketing solution program.

5. No exchanges will be accepted without a valid Return Authorization number.

6. At the end of the 12 months, if there are any marketing monies owed to KGK Jewelry, the owed marking amount will be deducted from the initial exchange merchandise amount; the remaining balance is the new available exchange merchandise amount.

7. If the jeweler is past due more than 30 days from their agreed payment terms on all invoices, the jeweler forfeits all rights to any exchange privileges.

8. Every piece of KGK merchandise sold must be validated with the consumer protection card.

9. All accounts must agree to the KGK SPIFF program. The jeweler's employee who makes the sales and properly validates the consumer protection card will receive 1.0% of the retail value of the sale. These funds will be transferred via wire transaction to the respective sales associate's personal account.

10. If the initial purchase has not exceeded $100,000 (Diamond Level), the jeweler agrees to pay KGK Jewelry for marketing support as follows:
    - Initial order $75,000 to $99,000    (Emerald Level)   = $3,000; 4 equal payments
    - Initial order $50,000 to $74,000    (Ruby Level)      = $6,000; 4 equal payments
    - Initial order under $50,000          (Sapphire Level)  = $12,000; 4 equal payments

**Payments will begin 30 days after receipt of initial merchandise received.

Marketing support and investment level will be determined after 12 months from the initial program purchase and after any exchanges of merchandise have been processed.
If the total net volume has elevated the jeweler's account to a higher marketing support level, KGK Jewelry will credit the account any monies owed.

By signing my name below, I agree to all the above terms and conditions listed.

Signature of Jeweler                              Signature of Sales Representative

Printed Name: _____                    Printed Name: _____

Date: _____                            Date: _____

DOCUMENT DIVIDER SHEET

NEW YORK
KGK JEWELRY LLC
866-KGK-8080
Kgkjewelry.com

BELGIUM
KGK Diamonds
B.V.B.A.

RUSSIA
S.D. Diamond LLC

SOUTH AFRICA
KGK Star Rough
(PTY) Ltd.

INDIA
KGK Enterprises

CHINA
KGK Jewellery
Mfg. Ltd.

HONG KONG
KGK Jewellery
(HK) Ltd.

THAILAND
KGK Gems Limited

UAE
KGK Diamond &
Jewellery LLC

JAPAN
KGK Jewellery Inc.



Over 106 Years
of Commitment & Trust
to the Trade



# KGK JEWELRY LLC

### (Affiliate of KGK Diamonds Mumbia a DTC Sightholder)

Dear Alan Miller Jewelers,

On behalf of KGK Jewelry, it is with great pleasure that we thank you for your business and appreciate your continued support. We hope you share in our excitement as we embark on the journey to promote the most important brand of all—**YOUR OWN!**

As discussed with your sales representative, below is a list of your purchased programs, agreed payment terms and other several important details.

In addition, we have also included the Marketing Investment Level for which you currently qualify.

## Your Purchased Programs:

| | |
|---|---|
| 1 | **Our Destiny** |
| 2 | **CoCo Couture** |

## Your Marketing Investment Level is:

**Diamond Level**

KGK Jewelry will invoice marketing support as listed below; payments will begin 30 days after receipt of initial merchandise received.  Below is the payment schedule for your Investment Level.

**Diamond Level = no payment required**

## Your Agreed Payment Terms:

**Full payment due 02/10/12**

As a reminder and for your convenience, below is a list of the marketing components included in the E-commerce marketing campaign.

1   Customized Home Page available (if needed)
2   ESDN membership with KGK's $5 million virtual inventory
3   ESDN annual support
4   Quick Hits / E-blasts: 6 quick hits per collection
5   Facebook / Twitter interaction
6   24" touch-screen computer monitor, customized for your store
7   Personalized duratrans: 2 per collection
8   Personalized in-store display with every program purchased
9   Personalized postcards with every program purchased
10  In-store events
11  Lookbooks with program purchased
12  Customer video E-blasts
13  Consumer Protection Cards
14  Personalized newspaper and billboard templates
15  SPIFF Program: automatic re-order program
16  TV commercials
17  Personalized displays
18  Custom Flyer Production
19  Flip Catalog: digital catalog for emailing
20  National Monthly Drawing


**Our representative will be contacting you shortly to review your website and to answer any additional technical questions you might have.

As per your agreement with your sales representative, you will also be receiving the following **EXTRAS!**

**No Charges on all marketing materials**
**30 day return on all special order prices**
**$50,000 total purchase- 12 monthly payments**

Again, we thank you for your order and encourage you to contact us should you have any questions regarding your e-commerce marketing program.

Sincerely,

Kristin Stevens
Marketing Coordinator
1-866-545-8080 ext. 107

Susan Hect
Customer Website Project Manager
1-866-545-8080 ext. 106

Kathryn Hecht
Director of Customer Relations
1-866-545-8080 ext. 105



**Over 106 Years**
**of Commitment & Trust**
**in the Trade**

# Jeweler's Commitment

1. The jeweler must submit payment in full for all invoiced merchandise before an exchange authorization can be generated. Merchandise cannot be exchanged within 12 months of initial program invoice. Only initial program merchandise is eligible for exchange; re-ordered merchandise is not eligible for exchange. Merchandise being exchanged must be done within 14 months from the date of invoice.

2. Marketing support and investment level are determined only after the agreed exchange dollars are deducted from the jeweler's annual invoices.

3. To be eligible for exchange privileges, the jeweler must agree to the automatic replenish program. The replenish product will be shipped to the jeweler within 3 business days for the non-branding inventory or 14 business days for branded inventory.

4. To receive an exchange authorization, the jeweler must adhere to the KGK Jewelry extensive marketing solution program.

5. No exchanges will be accepted without a valid Return Authorization number.

6. At the end of the 12 months, if there are any marketing monies owed to KGK Jewelry, the owed marking dollars will be deducted from the initial exchange merchandise amount. The remaining balance is the new available exchange merchandise amount.

7. If the jeweler is past due more than 30 days from their agreed payment terms on all invoices, the jeweler forfeits all rights to any exchange privileges.

8. Every piece of KGK merchandise sold must be validated with the consumer protection card.

9. All accounts must agree to the KGK SPIFF program. The jeweler's employee who makes the sales and properly validates the consumer protection card will receive 1.0% of the retail value of the sale. These funds will be transferred via wire transaction to the respective sales associate's personal account.

10. If the initial purchase has not exceeded $100,000 (Diamond Level) the jeweler agrees to pay KGK Jewelry for marketing support as follows:

   Initial order $75,000 to $99,000    (Emerald Level)  = $3,000; 4 equal payments
   Initial order $50,000 to $74,000    (Ruby Level)     = $6,000; 4 equal payments
   Initial order under $50,000         (Sapphire Level) = $12,000; 4 equal payments

**Payments will begin 30 days after receipt of initial merchandise received.

   Marketing support and investment level will be determined after 12 months from the initial program purchase and after any exchanges of merchandise have been processed.
   If the total net volume has elevated the jeweler's account to a higher marketing support level, KGK Jewelry will credit the account any monies owed.

By signing my name below, I agree to all the above terms and conditions listed.

Signature of Jeweler                          Signature of Sales Representative

Printed Name: ALAN R-MILLER                   Printed Name: Greg Carlin

Date: 8/15/11                                 Date: 8-15-2011

* 30 DAY RETURN ON ALL SPECIAL ORDER PIECES

* 50,000 total purchase over 12 months

N/C ALL marketing material

# DOCUMENT DIVIDER SHEET





Over 106 Years
of Commitment & Trust
to the Trade

# KGK JEWELRY LLC
### (Affiliate of KGK Diamonds Mumbia a DTC Sightholder)

**NEW YORK**
**KGK JEWELRY LLC**
866-KGK-8080
Kgkjewelry.com

**BELGIUM**
**KGK Diamonds**
**B.V.B.A.**

**RUSSIA**
**S.D. Diamond LLC**

**SOUTH AFRICA**
**KGK Star Rough**
**(PTY) Ltd.**

**INDIA**
**KGK Enterprises**

**CHINA**
**KGK Jewellery**
**Mfg. Ltd.**

**HONG KONG**
**KGK Jewellery**
**(HK) Ltd.**

**THAILAND**
**KGK Gems Limited**

**UAE**
**KGK Diamond &**
**Jewellery LLC**

**JAPAN**
**KGK Jewellery Inc.**

Dear Anderson Jewelers,

On behalf of KGK Jewelry, it is with great pleasure that we thank you for your business and appreciate your continued support. We hope you share in our excitement as we embark on the journey to promote the most important brand of all—**YOUR OWN!**

As discussed with your sales representative, below is a list of your purchased programs, agreed payment terms and other several important details.

In addition, we have also included the Marketing Investment Level for which you currently qualify.

### Your Purchased Programs:

1      **Our Destiny**
2      **CoCo Couture**
3      **Precious Trends**

      ***Not complete collections**

### Your Marketing Investment Level is:

**Ruby Level**

KGK Jewelry will invoice marketing support as listed below; payments will begin 30 days after receipt of initial merchandise received.  Below is the payment schedule for your Investment Level.

**Ruby Level = $6000; 4 equal payments**
### Your Agreed Payment Terms:

**3 equal payments 01/15/12, 02/15/12, 03/15/12**

As a reminder and for your convenience, below is a list of the marketing components included in the E-commerce marketing campaign.

1   Customized Home Page available (if needed)
2   ESDN membership with KGK's $5 million virtual inventory
3   ESDN annual support
4   Quick Hits / E-blasts: 6 quick hits per collection
5   Facebook / Twitter interaction
6   24" touch-screen computer monitor, customized for your store
7   Personalized duratrans: 2 per collection
8   Personalized in-store display with every program purchased
9   Personalized postcards with every program purchased
10  In-store events
11  Lookbooks with program purchased
12  Customer video E-blasts
13  Consumer Protection Cards
14  Personalized newspaper and billboard templates
15  SPIFF Program: automatic re-order program
16  TV commercials
17  Personalized displays
18  Custom Flyer Production
19  Flip Catalog: digital catalog for emailing
20  National Monthly Drawing

**Our representative will be contacting you shortly to review your website and to answer any additional technical questions you might have.


Again, we thank you for your order and encourage you to contact us should you have any questions regarding your e-commerce marketing program.


Sincerely,

Kristin Stevens
Marketing Coordinator
1-866-545-8080 ext. 107

Susan Hect
Customer Website Project Manager
1-866-545-8080 ext. 106

Kathryn Hecht
Director of Customer Relations
1-866-545-8080 ext. 105



Over 106 Years
of Commitment & Trust
to the Trade

# RJO Jeweler's Commitment

1.  The jeweler must submit payment in full for all invoiced merchandise before an exchange authorization can be generated. Merchandise cannot be exchanged within 12 months of initial program invoice. Only initial program merchandise is eligible for exchange; re-ordered merchandise is not eligible for exchange. Merchandise being exchanged must be done within 14 months from the date of invoice.

2.  Marketing support and investment level are determined only after the agreed exchange dollars are deducted from the jeweler's annual invoices.

3.  To be eligible for exchange privileges, the jeweler must agree to the automatic replenish program. The replenish product will be shipped to the jeweler within 3 business days for the non-branding inventory or 14 business days for branded inventory.

4.  To receive an exchange authorization, the jeweler must adhere to the KGK Jewelry extensive marketing solution program.

5.  No exchanges will be accepted without a valid Return Authorization number.

6.  At the end of the 12 months, if there are any marketing monies owed to KGK Jewelry, the owed marking amount will be deducted from the initial exchange merchandise amount; the remaining balance is the new available exchange merchandise amount.

7.  If the jeweler is past due more than 30 days from their agreed payment terms on all invoices, the jeweler forfeits all rights to any exchange privileges.

8.  Every piece of KGK merchandise sold must be validated with the consumer protection card.

9.  All accounts must agree to the KGK SPIFF program. The jeweler's employee who makes the sales and properly validates the consumer protection card will receive 1.0% of the retail value of the sale. These funds will be transferred via wire transaction to the respective sales associate's personal account.

10. If the initial purchase has not exceeded $50,000 (Diamond Level), the jeweler agrees to pay KGK Jewelry for marketing support as follows:
    • Initial order under $50,000          (Ruby Level)        = $6,000; 4 equal payments
    *Emerald level*
    **Payments will begin 30 days after receipt of initial merchandise received.

    Marketing support and investment level will be determined after 12 months from the initial program purchase and after any exchanges of merchandise have been processed.
    If the total net volume has elevated the jeweler's account to a higher marketing support level, KGK Jewelry will credit the account any monies owed.

By signing my name below, I agree to all the above terms and conditions listed.

Signature of Jeweler _____     Signature of Sales Representative _____

Printed Name: _Deb Grainger_          Printed Name: _Ray Hart_

Date: _8/15/11_                        Date: _8/18/11_

# EXHIBIT B

Oct 21 2011 4:04PM   www.abqa.com   6069092472   P. 4







Over 106 Years
of Commitment & Trust
to the Trade

# KGK JEWELRY LLC

(Affiliate of KGK Enterprises Mumbia a DTC Sightholder)

**NEW YORK**
KGK JEWELRY LLC
KGK Diamonds LLC
KGK Precious

**BELGIUM**
KGK Diamonds
B.V.B.A.

**RUSSIA**
S.D. Diamond LLC

**SOUTH AFRICA**
KGK Star Rough
(PTY) Ltd.

**INDIA**
KGK Enterprises

**CHINA**
KGK Jewellery
Mfg. Ltd.

**HONG KONG**
KGK Jewellery
(HK) Ltd.

**THAILAND**
KGK Gems Limited

**UAE**
KGK Diamond &
Jewellery LLC

**JAPAN**
KGK Jewellery Inc.

Dear Steve Yeko,

This letter is confirming that KGK has paid ESDN in full for the for the marketing services for the attached 52 jewelers.

The marketing services are as follows:

1- Membership in ESDN, including KGK online catalog.

2- Annually ESDN support

3- 24 inch touch screen
computer customized for each jeweler.

4- 18  E Blasts per jeweler.

5- Social media posts for each jeweler. (Facebook and Twitter ) 18 quantity as per E- Blasts

6-  3- Custom Video E - Blast.

7- Banking set up fees.

Please confirm all of the above by signing your name below.

_____        _____
Steve Yeko Signature                    Date

| Customers that have been paid for ESDN services | |
|---|---|
| 1 | Steffan's Jewelers |
| 2 | Von's Jewelry |
| 3 | A.J. Klein |
| 4 | Herman Hiss |
| 5 | Winklers |
| 6 | Waterfall Jewelers |
| 7 | Rottermond |
| 8 | Lewis Jewelers |
| 9 | Mills Jewelers |
| 10 | Diamonds Plus DBA Gross |
| 11 | Komara |
| 12 | Sanborns |
| 13 | Fords Jewelry |
| 14 | Monarch Jewelers |
| 15 | Fabri Fine Jewelry |
| 16 | Garrick Jewelers |
| 17 | Steel Jewelers |
| 18 | Peoples Pottery |
| 19 | Jewelry Station |
| 20 | Kuhns Jewelers |
| 21 | Noble House |
| 22 | Gordons |
| 23 | Belle Jewelers |
| 24 | Catalina Holdings |
| 25 | Diamond Center |
| 26 | Distinctive Gold |
| 27 | Rasmussen Jewelers |
| 28 | Devon Jewelry |
| 29 | Leo Marks |
| 30 | Simon Jewelers |
| 31 | Segners Jewelers |
| 32 | Forever Diamonds |
| 33 | Johnston Jewelers |
| 34 | Maurice's |
| 35 | Jay Jewelers |
| 36 | Diamond Cutters |
| 37 | Bailey's Fine Jewelry |
| 38 | J.W. Jewelers |
| 39 | JG Kronenberger |
| 40 | Plateau Jewelers |
| 41 | Neckers Jewelry |
| 42 | Venus Creations |
| 43 | Parry Jewelers |
| 44 | Color Duty Free |
| 45 | Royal Creations |
| 46 | Warwick Jewelers |
| 47 | Ruby and Sons |
| 48 | Sturhahn Jewelers |
| 49 | Michael's |
| 50 | I.M. Jewelers |
| 51 | Michelson |

DOCUMENT DIVIDER SHEET

Oct 21 2011 4:04PM   www.aGya .com          6083052472          P.2

212-893-8083





NEW YORK
KGK JEWELRY LLC
KGK Diamonds LLC
KGK Precious

Over 106 Years
of Commitment & Trust
to the Trade

## KGK JEWELRY LLC

(Affiliate of KGK Enterprises Mumbia a DTC Sightholder)

BELGIUM
KGK Diamonds
B.V.B.A.

RUSSIA
S.D. Diamond LLC

SOUTH AFRICA
KGK Star Rough
(PTY) Ltd.

INDIA
KGK Enterprises

CHINA
KGK Jewellery
Mfg. Ltd.

HONG KONG
KGK Jewellery
(HK) Ltd.

THAILAND
KGK Gems Limited

UAE
KGK Diamond &
Jewellery LLC

JAPAN
KGK Jewellery Inc.

Dear Steve Yeko,

This letter is confirming that KGK will pay ESDN in full amount of $98,325 for the marketing services for the attached 19 jewelers.

The marketing services are as follows:

1- Membership in ESDN, including KGK online catalog.

2- Annually ESDN support

3- 24 inch touch screen
computer customized for each jeweler.

4- 18  E Blasts per jeweler.

5- Social media posts for each jeweler. (Facebook and Twitter ) 18 quantity as per E- Blasts

6-  3- Custom Video E - Blast.

7- Banking set up fees.

Please confirm all of the above by signing your name below.

_____          10-20-11
Steve Yeko Signature              Date

| | Customers that have NOT been paid for ESDN services |
|---|---|
| 1 | Giganti and Giganti |
| 2 | Cone |
| 3 | Christensen Jewelry |
| 4 | Nelson Jewelry |
| 5 | Don Basch Jewelers |
| 6 | Alan Miller Jewelers |
| 7 | Anderson Jewelers |
| 8 | Hustedt |
| 9 | McChristy Jewlers |
| 10 | Windsor Jewelers |
| 11 | Alexanders |
| 12 | Wickersham |
| 13 | Medawar |
| 14 | Ecolin |
| 15 | Jewelry Boutique |
| 16 | Elmquist |
| 17 | Charles Frederick Jewelers |
| 18 | Albert's |
| 19 | Eaton's Fine Jewelry |

# EXHIBIT C

About « ESDNetwork

ESDNetwork » About

## ABOUT ESD*NETWORK*



Web-savvy shoppers aren't willing to give up the best features of brick and mortar retailers when they shop online. Customers want service, selection, and convenience!

Give it to them with ESD*Network*!

At ESD*Network*, we bring retailers and suppliers together to offer the best online shopping experience possible!

Suppliers adore us, because we recognize the need for them to give their existing customers a way to buy their products online, and

attract new customers, while still maintaining brand integrity across hundreds of retailer websites. With our tools, ESD*Network* Premier Brands are in complete control of their marketing.

Our retailer partners love ESD*Network* Premier Brands because they get stunning digital catalogs, 360° product views, and they never have to worry about updating any ESD*Network* Premier Brand content. Everybody wins!

We unite retailers, suppliers, and consumers. ESD*Network* is advanced e-commerce for everyone!

### STEVE YEKO
Chief Executive Officer


Mr. Yeko leverages his thirty plus years in the jewelry industry with the introduction of a business model so dynamic that it has created a paradigm shift in what industries understand as the "sweet spot" – the all-in-one place suppliers, retailers, and consumers unite. He is the creator of ESD*Network*, as well as aGQa (accurate Grading Quality assurance), the patented jewelry certificate of authenticity, and owner of two of the largest retail jewelry stores in the state of Wisconsin. As an entrepreneur and leader, Mr. Yeko's vision is coalescing the business world with user-friendly technology innovation.

Looking for a challenge? Take a look at our Career **Opportunities** to learn more about joining our team.

**ESDNETWORK**

About Us

Careers

Privacy

Contact

Developers

**CONTACT US**

E-mail : Support

Phone : 1.866.990.3736

**STAY CONNECTED**

**SUBSCRIBE TO OUR NEWSLETTER**

Sign up for our latest news

GO

© Copyright 2012 ESDNetwork. All rights reserved.

Support